UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ISMAEL ANTONIO RODRIGUEZ PEREZ,<br><br>            Plaintiff,<br><br>    v.<br><br>FIRST TECH FEDERAL CREDIT UNION,<br><br>            Defendant. | Case No. 23-cv-06704-TSH<br><br>**ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MOTION FOR ATTORNEYS' FEES**<br><br>Re: Dkt. No. 35, 36 |

## I.    INTRODUCTION

Plaintiff Ismael Antonio Rodriguez Perez brings this putative class action against First Technology Federal Credit Union, alleging claims for alienage discrimination in violation of the Civil Rights Act of 1966, 42 U.S.C. § 1981, and the California Unruh Civil Rights Act, Cal. Civ. Code §§ 51, et seq. ("Unruh Act").  Plaintiff alleges First Tech has a policy of denying applicants for residential secured loans based on their immigration and/or citizenship status.  Pending before the Court is Plaintiff's unopposed motion for final approval of class action settlement ("Class Mot.," ECF No. 36) and unopposed motion for attorneys' fees ("Fees Mot.," ECF No. 35).  The Court held a final fairness hearing on January 23, 2025.  For the reasons stated below, the Court **GRANTS** the motions.[1]

## II.    BACKGROUND

### A.    Factual Background

Since 2012, Plaintiff has been a recipient of Deferred Action for Childhood Arrivals ("DACA").  Compl. ¶ 7, ECF No. 1.  As part of the DACA initiative, Plaintiff received

---

[1] The parties consent to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  ECF Nos. 7, 18.

authorization to work in the United States and a Social Security Number. *Id.* First Union is a member-owned and federally chartered credit union headquartered in San Jose, California. *Id.* ¶ 9. It offers consumers a range of financial and credit products, including retail banking services, business and life insurance products, personal loans, auto loans, credit cards, and home loans. *Id.* ¶ 11.

In June 2022, Plaintiff applied for a home equity line of credit from First Tech. *Id.* ¶ 15. As part of the process, a First Tech loan officer instructed Plaintiff that he must provide his legal residency card. *Id.* ¶ 16. Plaintiff informed First Tech that he did not have a permanent residence/green card. *Id.* ¶ 19. First Tech then requested he upload a current I-94 visa. *Id.* Plaintiff explained that his I-94 visa was expired, and that his only current documentation was his employment authorization card ("EAD"). *Id.* First Tech then informed Plaintiff that neither an EAD nor an I-94 would be sufficient documentation on its own, and that DACA recipients are not eligible for the loan he applied for. *Id.* ¶ 20. On August 1, 2022, First Tech denied Plaintiff's application and sent an adverse action notice indicating that "excessive obligations," "insufficient income for total obligations," and "unable to verify residency" were the principal reasons for the credit denial. *Id.* ¶ 21.

**B.    Procedural Background**

On December 29, 2023, Plaintiff filed the present complaint against First Tech, alleging claims under 42 U.S.C. § 1981 and the Unruh Act. The parties subsequently engaged in negotiations to resolve the claims, ultimately resulting in an agreement in principle to settle this action. ECF No. 29. On September 5, 2024, Plaintiff filed his Motion for Preliminary Approval of Class Action Settlement. ECF No. 31. On October 8, 2024, the Court granted preliminary approval of the settlement. ECF No. 34; *Rodriguez Perez v. First Tech Fed. Credit Union*, 2024 WL 4453291, at *1 (N.D. Cal. Oct. 8, 2024).

### III.    SETTLEMENT AGREEMENT

**A.    The Settlement Class**

The Settlement Class is defined as: (i) the "California Class," consisting of 20 individuals who, according to First Tech's records, were residing in California and applied for a Residential

2

Secured Loan with First Tech from December 29, 2021 through December 29, 2023, provided an EAD during the application process, and were denied their application solely because of their immigration or citizenship status at the time they applied; and (ii) the "National Class," consisting of 43 individuals who, according to First Tech's records, were residing in any state of the United States other than California and applied for a Residential Secured Loan with First Tech from December 29, 2021 through December 29, 2023, provided an EAD during the application process, and were denied their application solely because of their immigration or citizenship status at the time they applied. Lozada Decl., Ex. A (Settlement Agreement) §§ 1(c) and 1(q). ECF No. 31-2.

The Settlement provides two forms of relief for Class Members: (1) corrective action under which First Tech will not deny residential secured loan applications based solely on an applicant's immigration or citizenship status, unless required by law, rules, or regulations to do so, and will amend its underwriting criteria accordingly, *id.* § 2; and (2) First Tech will pay $81,500 to be used for individual payments by check made payable to each Class Member (the "Settlement Fund") to compensate Class Members for the alleged statutory violations and harm suffered, *id.* §§ 1(m), 1(v) and 11.

**B.    Payment Terms**

First Tech agreed to create a $81,500 Settlement Fund that will be used to make individual payments in the amount of $3,000 by check to each California Class Member, and individual payments in the amount of $500 by check to each National Class Member. *Id.* § 1(m). The Settlement Fund will be paid to Class Members; First Tech will separately pay the costs of administration, court approved attorneys' fees and costs, and incentive award. *Id.* § 1(v).

The Settlement does not require Class Members to submit a claim to claim the monies they are entitled to under the Settlement. *Id.* § 11(a), (d)(iv). Rather, payments will be made to Class Members by check payable to the Class Member and mailed to the Class Member's last known address. *Id.* §§ 5(b), 11(d)(iv). Addresses will be updated by the Claims Administrator through skip-trace or other means. *Id.* § 5(b).

**C.    *Cy Pres* Distribution of any Unclaimed Settlement Funds**

If any checks mailed to Class Members remain uncashed for 120 days after the checks are

sent ("Unclaimed Settlement Funds"), those funds do not revert to First Tech. *Id*. §§ 1(w) and 12. Instead, any Unclaimed Settlement Funds will be paid to a *cy pres* recipient proposed by Class Counsel and approved by the Court. *Id*.

**D.    Release**

In exchange for the settlement, the following release applies:

> **<u>GENERAL RELEASE.</u>** Except as to the rights and obligations provided for under the terms of this Agreement, Named Plaintiff, on behalf of himself and each Class Member who does not opt-out (collectively, "Releasors"), hereby releases and forever discharges Defendant, and all of its past, present and future predecessors, successors, parents, subsidiaries, divisions, employees, affiliates, assigns, officers, directors, members, representatives, attorneys, insurers and agents (collectively, the "Releasees") from any and all losses, fees, charges, complaints, claims, debts, liabilities, demands, obligations, costs, expenses, actions, and causes of action of every nature, character, and description, whether known or unknown, asserted or unasserted, suspected or unsuspected, fixed or contingent, which Releasors now have, own or hold against any of the Releasees that arise out of and/or relate to the facts and claims alleged in the Complaint, including any claims relating to or arising out of the Challenged Practice.

*Id.* § 13.

**E.    Attorneys' Fees and Expenses, Settlement Administrator's Costs, and Class Representative Service Award**

Attorneys' fees, cost of litigation, and the cost of notice and administration shall be paid by First Tech in addition to the payments to Class Members. These expenses will be paid separate and apart from the Settlement Fund. *Id*. at § 1(v). As part of their settlement, the parties agreed that Class Counsel would file a motion seeking approval for its attorneys' fees and costs, and that First Tech would not oppose an application for attorneys' fees of up to $50,000. *Id*. §§ 9, 11(d)(i). The parties also agreed that Class Counsel would request the Court approve a payment of the Settlement Administrator's costs up to $13,000 and a Service Award for Plaintiff of up to $5,000. *Id*. § 11(d)(ii), (iii).

**F.    Notice**

On October 15, 2024, First Tech sent RG2 Claims Administration, LLC (the court-appointed settlement administrator) the Settlement Class List consisting of 63 individuals.

United States District Court
Northern District of California

1  Baldwin Decl. ¶ 5, ECF No. 36-1.  The list contained each Class Member's name, contact

2  information, social security number, and the state of residence at the time of their application.  *Id*.

3  RG2 reviewed the records and ran the mailing file through the U.S. Postal Service's National

4  Change of Address Database.  *Id*. ¶ 7.

5      Beginning on November 6, 2024, RG2 mailed the Court-approved Notice Packet to all 63

6  Class Members via USPS first-class mail.  *Id*.  The Notice Packet consisted of the Notice and

7  English and Spanish instructions.  *Id*.  Concurrent to the mailing, RG2 also emailed the Notice to

8  the Class Members for whom email addresses were provided in the class data.  *Id*. ¶ 8.  Of these

9  mailed Notice Packets, eleven were returned as undeliverable without a forwarding address.  *Id*. ¶

10  9.  RG2 performed a skip-trace and identified all eleven updated addresses.  *Id*.  RG2 re-mailed

11  Notices to the eleven Class Members under skip-tracing.  *Id*.  None of the eleven re-mailed

12  Notices have been returned by the USPS.  *Id*.  A total of zero Notices remain undeliverable.  *Id*.

13      RG2 also maintained a website, www.PerezDACAClassSettlement.com, containing

14  downloadable versions of the Long- and Short-Form Notices in English and Spanish, Settlement

15  Agreement, Preliminary Approval Order, and brief summary of the Settlement.  *Id.* ¶ 6.  The

16  website has a "Contact Us" page that provides the mailing address, phone number and email

17  address to contact RG2 and Class Counsel.  *Id*.  RG2 also created a toll-free number to speak with

18  a live bilingual operator.  *Id*. ¶ 10.  Class Members may leave a message for RG2 to call them

19  back through an automated Spanish recording.  *Id*.

20      The Settlement does not require Class Members to submit a claim to collect the individual

21  payments under the Settlement.  Settlement Agreement § 11(d)(iv).  Within 10 days of the

22  Effective Date, the Settlement Administrator will mail a check in the amount of $3,000 to each

23  California Class Member and will mail a check in the amount of $500 to each National Class

24  Member, and all checks must be cashed within 120 days after the Settlement Administrator issued

25  the checks.  *Id*.

26      The deadline for Class Members to opt-out or object to the Settlement was December 6,

27  2024.  Baldwin Decl. ¶ 12.  No Class Members have opted-out of or objected to the Settlement.

28  *Id*. ¶¶ 13, 14.  The Effective Date is 30 days after the entry of the Final Approval Order.

1    Settlement Agreement § 1(h).

2    ### IV.   DISCUSSION

3    The approval of a settlement is a multi-step process.  At the preliminary approval stage, the

4    Court should grant such approval only if it is justified by the parties' showing that the Court will

5    likely be able to (1) "certify the class for purposes of judgment on the proposal" and (2) "approve

6    the proposal under Rule 23(e)(2)."  Fed. R. Civ. P. 23(e)(1)(B).  If the Court preliminarily certifies

7    the class and finds the settlement appropriate after "a preliminary fairness evaluation," then the

8    class will be notified, and a final fairness hearing scheduled to determine if the settlement is fair,

9    adequate, and reasonable pursuant to Rule 23.  *Villegas v. J.P. Morgan Chase & Co.*, 2012 WL

10   5878390, at *5 (N.D. Cal. Nov. 21, 2012).

11   At the second stage, "after notice is given to putative class members, the Court entertains

12   any of their objections to (1) the treatment of the litigation as a class action and/or (2) the terms of

13   the settlement."  *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. 2014) (citing *Diaz v. Tr.*

14   *Territory of Pac. Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989)).  Following the final fairness

15   hearing, the Court must finally determine whether the parties should be allowed to settle the class

16   action pursuant to their agreed upon terms.  *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,

17   221 F.R.D. 523, 525 (C.D. Cal. 2004).

18   **A.    Class Certification**

19   The Court preliminarily approved certification of the proposed Settlement Class under

20   Rule 23(b)(3).  ECF No. 34.  Thus, "the only information ordinarily necessary is whether the

21   proposed settlement calls for any change in the class certified, or of the claims, defenses, or issues

22   regarding which certification was granted."  Fed. R. Civ. P. 23 Advisory Committee's Note to

23   2018 Amendment.  Nothing in the current submission gives the Court reason to reconsider its

24   prior certification order.

25   **B.    Adequacy of Notice**

26   Under Federal Rule of Civil Procedure 23(e), the Court "must direct notice in a reasonable

27   manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1)(B).

28   Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances,

United States District Court
Northern District of California

including individual notice to all members who can be identified through reasonable effort." The notice must "clearly and concisely state in plain, easily understood language" the nature of the action, the class definition, and the class members' right to exclude themselves from the class. Fed. R. Civ. P. 23(c)(2)(B); *see also Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 575 (9th Cir. 2004) ("Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.") (cleaned up).  Although Rule 23 requires reasonable efforts be made to reach all class members, it does not require that each class member actually receive notice. *See Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994) (noting the standard for class notice is "best practicable" notice, not "actually received" notice).

The Court finds the notice plan approved by the Court and implemented by the Settlement Administrator complies with Rule 23(c)(2)(B).  First, the content of the Notice was sufficient under Rule 23(c)(2)(B).  Second, as discussed above, all 63 Class Members were mailed notice packets and, after skip tracing procedures, none have been returned as undeliverable.  Third, RG2 created a website which contains all the required documents.  Baldwin Decl. ¶¶ 6, 10.  RG2 also offered a toll-free phone number for Class Member inquiries.  *Id.*  Finally, no objections or requests for exclusion were received.  *Id.* ¶¶ 13-14.

Because Class Members have been given a full and fair opportunity to consider the terms of the proposed Settlement and make an informed decision on whether to participate, the Court finds that the notice was adequate and the best practicable.  *See Koeppen v. Carvana, LLC*, 2024 WL 3925703, at *5 (N.D. Cal. Aug. 22, 2024) (finding notice standards satisfied when claims administrator provided notice in accordance with the procedures previously approved by the court in its preliminary approval order); *Ford v. CEC Entm't Inc.*, 2015 WL 11439033, at *3 (S.D. Cal. Dec. 14, 2015) (same).

## C.   *Cy Pres* Award

A *cy pres* award is "a tool for 'distributing unclaimed or non-distributable portions of a class action settlement fund to the next best class of beneficiaries.'"  *In re Google Inc. St. View Elec. Commc'ns Litig.*, 21 F.4th 1102, 1111 (9th Cir. 2021) (quoting *Nachshin v. AOL, LLC*, 663

1   F.3d 1034, 1036 (9th Cir. 2011).  "*Cy pres* distributions must account for the nature of the

2   plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class

3   members, including their geographic diversity."  *Nachshin*, 663 F.3d at 1036.

4        As noted above, if any checks mailed to Class Members remain uncashed for 120 days

5   after the checks are sent, those funds do not revert to First Tech; instead, any unclaimed settlement

6   funds will be paid to a *cy pres* recipient proposed by Class Counsel and approved by the Court.

7   Settlement Agreement §§ 1(w), 12.  The parties have chosen TheDream.US and Immigrants

8   Rising as *cy pres* recipients.  ECF No. 38.  TheDream.US is the nation's largest college and career

9   success program for undocumented immigrants and has provided more than 10,000 scholarships to

10  DACA recipients.  *Id.*  Immigrant Rising transforms the lives of undocumented people through

11  college scholarships and resources, as well as career counseling.  *Id.*  The parties have shown there

12  is a nexus between the work of TheDream.US and Immigrants Rising and the subject matter of

13  this lawsuit—alleged discrimination against non-citizens.  Any *cy pres* distribution will promote

14  the organizations' mission to help non-citizens have a better future by allowing them to participate

15  and become part of society.  *Id.*  Accordingly, the Court approves TheDream.US and Immigrants

16  Rising as *cy pres* recipients.  In the event there are any unclaimed funds, TheDream.US and

17  Immigrants Rising will each receive a 50% share.

18  **D.      Final Approval of the Settlement Agreement**

19       To grant final approval, the Court must find that the terms of the parties' settlement are

20  fair, adequate, and reasonable under Rule 23(e).  In making this determination, courts generally

21  must consider the following factors: "(1) the strength of the plaintiff's case; (2) the risk, expense,

22  complexity, and likely duration of further litigation; (3) the risk of maintaining class action status

23  throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed

24  and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a

25  governmental participant; and (8) the reaction of the class members to the proposed settlement."

26  *Churchill Village*, 361 F.3d at 575.  "This list is not exclusive and different factors may

27  predominate in different factual contexts."  *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376

28  (9th Cir. 1993).  However, when "a settlement agreement is negotiated prior to formal class

United States District Court
Northern District of California

certification, consideration of these eight . . . factors alone is [insufficient]." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011). In such cases, courts must also ensure that the settlement did not result from collusion among the parties. *Id*. at 946-47.

As discussed below, a review of the fairness and *Bluetooth* factors indicates that the settlement is fair, adequate, and reasonable.

### 1.    The Fairness Factors

#### a.    The Strength of Plaintiff's Case and Risk, Expense, Complexity, and Likely Duration of Further Litigation

The Court first considers "the strength of the plaintiffs' case on the merits balanced against the amount offered in the settlement" and the risks of further litigation. *See Nat'l Rural Telecomm.*, 221 F.R.D. at 526 (cleaned up). Although this action reached settlement before the Court had occasion to consider the merits of Plaintiff's claims, the Court need not reach an ultimate conclusion about the merits of the dispute now, "for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). To that end, there is no "particular formula by which th[e] outcome must be tested." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009). Rather, the Court's assessment of the likelihood of success is "nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Id.* (internal quotation marks and citation omitted). "In reality, parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to a present value." *Id.* "In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Knapp v. Art.com, Inc.*, 283 F. Supp. 3d 823, 832 (N.D. Cal. 2017) (internal citation omitted).

Plaintiff alleges First Tech has a policy of denying applicants for residential secured loans based on their immigration and/or citizenship status. Plaintiff maintains he would likely prevail at trial. However, First Tech denies any liability associated with the claims and allegations and

denies that Plaintiff or the class members are entitled to any relief.  If the action had not settled, the parties likely faced a lengthy period of discovery, class certification, motions for summary judgment, and trial.  Such extensive litigation would be costly, time-consuming, and uncertain, and even if Plaintiff prevailed at trial, an appeal would likely follow.

Given the risks and costs of continued litigation, the immediate reward to class members through settlement is preferable.  Further, "[t]he benefit of receiving this money now rather than later at some unidentified and uncertain time has its own value." *Dixon v. Cushman & Wakefield W., Inc.*, 2022 WL 1189883, at *6 (N.D. Cal. Apr. 21, 2022).  Thus, the challenges Plaintiff would face should this case move forward instead of settling, in contrast to the finality and speed of recovery under the Settlement Agreement, weigh in favor of approving the settlement.

### b.    Settlement Amount

The amount of recovery offered also favors final approval of the settlement.  When considering the fairness and adequacy of the amount offered in settlement, "it is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Nat'l Rural Telecomm.*, 221 F.R.D. at 527.  "[I]t is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *Id.* (collecting cases).

In addition to corrective action, through which First Tech has modified its policies and will no longer deny applicants Residential Secured Loans on the basis of their immigration status, First Tech has agreed to create a Settlement Fund of $81,500 that will cover individual payments to the 20 California Class Members and 43 National Class Members.  Each California Class Member will receive approximately $3,000, which amounts to 75% of the $4,000 statutory damages available under the Unruh Act for each discriminatory act.  *See* Settlement Agreement § 11(d)(iv); Cal. Civ. Code § 52(a).  National Class Members will receive $500.  *See* Settlement Agreement § 11(d)(iv).  The Settlement provides Class Members with a substantial portion of their maximum possible recovery, along with corrective action that effectively eliminates the harm that Plaintiff alleged.  The financial compensation to Class Members of a substantial portion of the potential recovery at trial constitutes an exceptional result that supports approving the Settlement.  *See*

United States District Court
Northern District of California

*Betancourt v. Advantage Hum. Resourcing, Inc.*, 2016 WL 344532, at *1 (N.D. Cal. Jan. 28, 2016) (granting final approval of settlement providing approximately 9.7% of total maximum potential recovery if class members had prevailed on all claims); *Stovall-Gusman v. W.W. Granger, Inc.*, 2015 WL 3776765, at *4 (N.D. Cal. June 17, 2015) (finding that a settlement constituting 7.3% of plaintiff's estimated trial award to be "within the range of reasonableness").

Further, in granting preliminary approval, the Court concluded that the estimated payout to Settlement Class Members was fair in relation to the risks of continued litigation, and there is nothing in the final approval materials that changes the Court's analysis on this score.

Finally, as noted above, no eligible class member chose to op-out and none objected to the settlement. Thus, that "the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). The Court therefore concludes that the amount offered in settlement also weighs in favor of final approval.

### c.    Extent of Discovery Completed and Stage of Proceedings

In the context of class action settlements, as long as the parties have sufficient information to make an informed decision about settlement, "formal discovery is not a necessary ticket to the bargaining table." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998). Rather, a court's focus is on whether "the parties carefully investigated the claims before reaching a resolution." *Ontiveros*, 303 F.R.D. at 371. The Court's preliminary approval order discussed the settlement process in this case, which is the result of more than seven months of direct discussions and negotiations between the parties regarding the legal issues raised in this case, the merits of Plaintiff's claims, the accurate identification of proposed settlement class members, and the alleged potential damages. ECF No. 34 at 10. The parties, through counsel: exchanged informal discovery, including credit application and records, copies of policies and procedures, and records regarding First Tech's membership base, to assess the merits of Plaintiff's discrimination claims, and the number of potentially affected class members. *Id.* The Court affirms that preliminary determination and finds that the extent of discovery and stage of proceedings support approval of

1   the settlement.

####     d.      Experience and Views of Counsel

3       "The Ninth Circuit recognizes that parties represented by competent counsel are better

positioned than courts to produce a settlement that fairly reflects each party's expected outcome in

litigation." *Knapp*, 283 F. Supp. 3d at 833 (citation omitted).  Thus, Courts grant "great weight . .

. to the recommendation of counsel, who are most closely acquainted with the facts of the

underlying litigation." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab.*

*Litig.*, 229 F. Supp. 3d 1052, 1067 (N.D. Cal. 2017) (quoting *Nat'l Rural Telecomm.*, 221 F.R.D.

at 528).

10      Here, Class Counsel endorse the Settlement as fair, adequate, and reasonable.  Class

Counsel is experienced and capable of handling complex federal civil ligation, with extensive

experience in prosecuting and litigating civil rights actions.  Lozada Decl. ¶¶ 4–12, ECF No. 35-1.

Based on their experience and weighing all of the above factors, Class Counsel concluded that the

settlement is a favorable result that is in the best interest of Class Members.  Class Mot. at 15.

Accordingly, the experience and views of counsel also weigh in favor of approving the settlement.

####     e.      Presence of a Government Participant

17      In compliance with the Class Action Fairness Act, 28 U.S.C. § 1715, RG2 served CAFA

notices to the U.S. Attorney General and 24 State Attorney Generals of the applicable states on

September 19, 2024.  Class Mot. at 7.  No government entity has objected to the settlement or

sought to intervene.  "Although CAFA does not create an affirmative duty for either state or

federal officials to take any action in response to a class action settlement, CAFA presumes that,

once put on notice, state or federal officials will raise any concerns that they may have during the

normal course of the class action settlement procedures." *Garner v. State Farm Mut. Auto. Ins.*

*Co.*, 2010 WL 1687832, at \*14 (N.D. Cal. Apr. 22, 2010) (citation omitted).

####     f.      Reaction of Class Members

26      "'The reactions of the members of a class to a proposed settlement is a proper

consideration for the trial court.'" *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 528 (quoting 5

Moore's Federal Practice, § 23.85[2][d] (Matthew Bender 3d ed.)).  "In this regard, '[t]he

United States District Court
Northern District of California

representatives' views may be important in shaping the agreement and will usually be presented at the fairness hearing; they may be entitled to special weight because the representatives may have a better understanding of the case than most members of the class." *Id.* (quoting Manual for Complex Litigation, Third, § 30.44 (1995)).

No objections to the settlement have been received. "Courts have repeatedly recognized that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Garner*, 2010 WL 1687832, at *14 (cleaned up). Thus, the Court "may appropriately infer that a class action settlement is fair, adequate, and reasonable when few class members object to it." *Id.* (internal quotation marks and citation omitted).

### g.    Summary

In sum, the fairness factors weigh in favor of granting Plaintiff's motion for final approval of the class action settlement.

### 2.    The *Bluetooth* Factors

Given that the parties settled prior to class certification, the Court must look beyond the *Churchill* fairness factors and examine the settlement for evidence of collusion with an even higher level of scrutiny. *In re Bluetooth*, 654 F.3d at 946. The question here is whether the settlement was the result of good faith, arms-length negotiations or fraud and collusion. *See id.* In determining whether the settlement is the result of collusion, courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interest and that of certain class members to infect the negotiations." *Id.* at 947. The Ninth Circuit has identified three such signs:

(1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;

(2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class; and

(3) when the parties arrange for fees not awarded to revert to

13

defendants rather than be added to the class fund.

*Id.* (internal quotation marks and citations omitted).  However, "the *Bluetooth* factors are merely 'warning signs' that indicate the *potential* for collusion . . . .  [T]he Court need not reject the settlement outright."  *In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993, 1007 (N.D. Cal. 2015) (emphasis in original) (quoting *In re Bluetooth*, 654 F.3d at 947).  In *Bluetooth*, the Ninth Circuit explained that a "disproportion between the fee award and the benefit obtained for the class" does not make a settlement "per se unreasonable."  654 F.3d at 945 (emphasis omitted); *see also Roes, 1–2 v. SFBSC Mgmt*, 944 F.3d 1035, 1060 (9th Cir. 2019) (explaining that a "disproportionate attorneys' fee does not mean the settlement cannot still be fair, reasonable, or adequate").  When faced with a disproportionate fee, "the Court is merely obligated to 'assure itself that the fees awarded in the agreement were not unreasonably high' in light of the results obtained for class members."  *In re TracFone*, 112 F. Supp. 3d at 1007 (quoting *In re Bluetooth*, 654 F.3d at 947).

For the first *Bluetooth* factor, the Court compares the payout to the class (actual and expected) to class counsel's unopposed claim for fees.  *See Harris v. Vector Mktg. Corp.*, 2011 WL 4831157, at *6 (N.D. Cal. Oct. 12, 2011) (examining "whether a disproportionate part of the settlement is being awarded to class counsel" under the settlement agreement).  The gross settlement amount is $81,500 and Class Counsel seeks $35,000 in attorney's fees—43 percent of the Settlement Amount.  This ratio taken alone may be a sign of collusion.  *See In re Bluetooth*, 654 F.3d at 947.  However, First Tech has agreed to separately pay the costs of administration, court approved attorneys' fees and costs, and incentive award.  Settlement Agreement § 1(v).  Thus, the full $81,500 Settlement Fund will go to Class Members.  Further, as discussed below, the fees requested are less than Class Counsel's lodestar.  Thus, the Court finds that while the high percentage is a red flag, it does not raise a concern regarding collusion.  *See Ramirez v. Trans Union, LLC*, 2022 WL 17722395, at *7 (N.D. Cal. Dec. 15, 2022) (approving fee that amounted to 44 percent of the settlement amount); *Kastler v. Oh My Green, Inc.*, 2022 WL 1157491, at *8 (N.D. Cal. Apr. 19, 2022) (approving fee that amounted to 35 percent of the settlement amount).

The second warning sign—a "clear sailing" provision—is also present here.  A clear

14

sailing arrangement provides "for the payment of attorney's fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class[.]" *In re Bluetooth*, 654 F.3d at 947 (internal quotation marks and citation omitted). Thus, the Court "has a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class, being careful to avoid unreasonably high fees simply because they are uncontested." *Id.* (internal quotation marks and citation omitted). However, the Settlement Agreement does not appear to be an example of First Tech agreeing to pay Class Counsel excessive fees and costs in exchange for accepting an unfair settlement for the Class given that (1) the amount of fees sought is a less than counsels' lodestar and (2) the actual payout to Class Members is significant. Thus, the clear sailing provision, though a *Bluetooth* warning sign, does not signal collusion under the circumstances presented here.

The third warning sign—whether the parties have arranged for fees not awarded to the class to revert to defendant rather than be added to the settlement fund, *see In re Bluetooth*, 654 F.3d at 948—is not present here. The Settlement Agreement is non-reversionary—all of the funds will be distributed to the class members.

Accordingly, notwithstanding the existence of one of the three *Bluetooth* factors, the Court concludes the Settlement Agreement did not result from, nor was it influenced by, collusion. Instead, the Settlement Agreement adequately satisfies the Settlement Class Members' claims. As explained below, the amount of fees sought is reasonable as well.

### 3. Summary

In sum, the *Churchill* fairness factors support approval, and the *Bluetooth* factors do not indicate collusion. The Court is therefore satisfied that the Settlement Agreement was not the result of collusion between the parties and instead is the product of arms-length negotiations between experienced and professional counsel. There are no objections to address. For each of these reasons, the Settlement Agreement passes muster under Rule 23(e) and final approval is appropriate.

**E.      Motion for Attorney's Fees, Costs, and Class Representative Incentive Award**

      **1.      Attorneys' Fees**

Plaintiff also seeks attorneys' fees for his counsel, the Mexican American Legal Defense and Educational Fund. Rule 23 permits a court to award "reasonable attorneys' fees . . . that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "While attorneys' fees and costs may be awarded in a certified class action . . ., courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth*, 654 F.3d at 941 (citation omitted).

"Where a settlement produces a common fund for the benefit of the entire class," as here, "courts have discretion to employ either the lodestar method or the percentage-of-recovery method" to assess the reasonableness of the requested attorney's fee award. *Id*. at 942. "Because the benefit to the class is easily quantified in common-fund settlements," the Ninth Circuit permits district courts "to award attorneys a percentage of the common fund in lieu of the often more time-consuming task of calculating the lodestar." *Id*. Regardless of whether the court uses the lodestar or percentage approach, the main inquiry is whether the fee award is "reasonable in relation to what the plaintiffs recovered." *Powers v. Eichen*, 229 F.3d 1249, 1258 (9th Cir. 2000).

      **a.      Percentage of Recovery Method**

"Under the percentage-of-recovery method, the attorney's fees equal some percentage of the common settlement fund." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015). In the Ninth Circuit, "courts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure." *In re Bluetooth*, 654 F.3d at 942. "An adjustment, either up or down, must be accompanied by a reasonable explanation of why the benchmark is unreasonable under the circumstances." *Reyes v. Experian Info. Servs., Inc.*, 856 Fed. App'x 108, 110 (9th Cir. 2021) (cleaned up).

Here, the "constructive common fund" amounts to $149,500 – the sum of the class recovery ($81,500) plus the "clear sailing" for attorneys' fees and costs set forth in the Settlement Agreement ($50,000), settlement administration costs ($13,000), and incentive award ($5,000).

United States District Court
Northern District of California

1     *See, e.g., Banks v. Nissan N. Am., Inc.*, 2015 WL 7710297, at *7 n.5 (N.D. Cal. Nov. 30, 2015)

2     ("The total amount of the constructive common fund is $4,265,564.55, which includes the

3     $278,056.41 to be paid to the claimants, the $20,000 service payments to be paid to the four class

4     representatives, the $3,425,000 to be paid to class counsel, and the $542,508.14 to be paid to the

5     settlement administrator."); Manual for Complex Litigation § 21.7 (4th ed. 2020) (discussing that

6     the sum of the fund for class members' benefit and attorneys' fees and expenses "should be treated

7     as a settlement fund for the benefit of the class").  The request for attorneys' fees amounts to

8     23.4% of the constructive common fund.  That figure is below the presumptive 25% benchmark in

9     the Ninth Circuit for reasonableness.

10          Further, to determine the reasonableness of the percentage requested in a class action, the

11     Ninth Circuit has held that courts may consider the following factors when analyzing a request for

12     fees: "(1) the results achieved; (2) the risk of litigation; (3) the skill required and the quality of

13     work; (4) the contingent nature of the fee and the financial burden carried by the plaintiffs; and (5)

14     awards made in similar cases" with an emphasis on the result and benefit to the class a whole.  *In

15     re Omnivision*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008) (citing *Vizcaino v. Microsoft Corp.*,

16     290 F.3d 1043, 1048-50 (9th Cir. 2002).  "[T]hese factors are similar to those used in evaluating

17     the adequacy of a settlement."  *Id.*

18                              **i.     Results Achieved**

19          The results achieved are an important factor to consider when awarding attorneys' fees, as

20     they are relevant to ascertain the benefits to the class.  *See In re Omnivision*, 559 F. Supp. 2d at

21     1046 ("The overall result and benefit to the class from the litigation is the most critical factor in

22     granting a fee award."); *Vizcaino*, 290 F.3d at 1048 ("[C]ounsel pursued this case in the absence of

23     supporting precedents"); *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311

24     (9th Cir. 1990) (noting plaintiffs' "substantial success").  "Where a plaintiff has obtained excellent

25     results, his [or her] attorney should recover a fully compensatory fee."  *Hensley v. Eckerhart*, 461

26     U.S. 424, 435 (1983).

27          Here, Class Counsel achieved exceptional results for the Class.  The Settlement Agreement

28     provided that California Class Members will receive individual payments in the amount of $3,000,

17

1   and National Class Members will receive individual payments in the amount of $500. First Tech

2   agreed to create a Settlement Fund of $81,500, which will fund individual payments. Class

3   Counsel obtained this excellent result in the face of significant risk to both class certification and

4   liability, as this case presented a novel theory with numerous unsettled issues, including valuing

5   and modeling actual or economic damages for First Tech's denial of residential secured loans to

6   class members.

7   Further, non-monetary benefits conferred from this litigation is a relevant factor. *Vizcaino*,

8   290 F.3d at 1049 ("[C]ounsel's performance generated benefits beyond the cash settlement

9   fund."). "The court need not limit itself to monetary damages or cash settlement funds in

10  assessing the benefits of a litigation. Some important benefits are difficult to quantify, such as

11  clarifying a certain area of the law [or] forcing changes in corporate policies affecting thousands

12  of individuals." *Nat'l Fed. of the Blind v. Target Corp.*, 2009 WL 2390261, at *9 (N.D. Cal. Aug.

13  3, 2009) (internal citations omitted). Here, class members will also benefit from non-monetary

14  relief, as Plaintiff secured corrective action: First Tech has agreed to cease the practice of denying

15  residential secured loans to applicants solely based on their immigration status or lack of U.S.

16  citizenship. First Tech also has agreed to train its managers, supervisors, and staff on this new

17  policy. This additional and significant non-monetary benefit to class members provides additional

18  support for class counsel's application for fees.

19              **ii.      Risk of Litigation**

20  The Ninth Circuit recognizes that risk is an important factor in determining a reasonable

21  fee award. *See In re Omnivision*, 559 F. Supp. 2d at 1046–47 ("The risk that further litigation

22  might result in Plaintiffs not recovering at all, particularly a case involving complicated legal

23  issues, is a significant factor in the award of fees."). Courts should not only consider the recovery

24  obtained for the class, but also the risks taken by class counsel in pursuing litigation. *See In re*

25  *Pac. Enter. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (holding fees justified "because of the

26  complexity of the issues and risks."). Uncertainty is relevant in determining risk. *See Vizcaino*,

27  290 F.3d at 1048. Here, class counsel took considerable risk because of the complexity of issues

28  and uncertainty of recovery. The risks involved, among other things, certification issues, pleading

and proof issues, motion practice, and prevailing at trial.  Accordingly, class counsel's risk, combined with the excellent result achieved on behalf of the Class, supports the requested fees.

### iii.    Skill Required and Quality of Work

The skill of counsel is a relevant factor to consider when awarding attorneys' fees.  *See In re Omnivision*, 559 F. Supp. 2d at 1047.  The "prosecution and management of a complex national class action requires unique legal skills and abilities." *Id.* (quoting *Edmonds v. United States*, 658 F. Supp. 1126, 1137 (D.S.C. 1987)).  Here, class counsel is experienced in complex class actions. Lozada Decl. ¶¶ 5, 7, 11-12, 26-27, ECF No. 35-1.  This case involved a relatively novel and complex area of law regarding banking regulations and statutory interpretation.  Not only are class counsel versed in complex class actions, they are familiar and experienced in the areas of discrimination based on alienage and/or immigration status.  *Id.* ¶¶ 5, 7, 11-12, 26-27.  The excellent result obtained for class members is the product of class counsel's expertise, experience, and diligence in pursuing this litigation.

### iv.    Contingent Nature of the Fee and Financial Burden

A determination of an attorneys' fee award must also include consideration of the contingent nature of the fee and the difficulties that were overcome in obtaining the settlement. *See In re Omnivision*, 559 F. Supp. 2d at 1047.  "The importance of assuring adequate representation for plaintiffs who could not otherwise afford competent attorneys justifies providing those attorneys who do accept matters on a contingent-fee basis a larger fee than if they were billing by the hour or on a flat fee." *Id.*  "[A]ttorneys whose compensation depends on their winning the case must make up in compensation in the cases they win for the lack of compensation in the cases they lose." *Vizcaino*, 290 F.3d at 1051.  Further, at the same time as the contingent fee "automatically aligns interests of lawyer and client, rewards exceptional success, and penalizes failure, the contingent fee automatically handles compensation for the uncertainty of litigation." *Kirchoff v. Flynn*, 786 F.2d 320, 326 (7th Cir. 1986).

Here, class counsel undertook this litigation on a contingency basis, with no assurance of recovering any attorneys' fees or reimbursement of costs.  Class counsel initiated complex and potentially expensive and lengthy litigation and dedicated resources of attorneys and other

personnel, with no guarantee of compensation for the amount of time, expenses, and effort that they were prepared to and did invest to prosecute this case.  Lozada Decl. ¶¶ 23-25.  Class counsel's risks, together with the excellent result that has been achieved on behalf of class members, support Plaintiff's request for fees.

### v.    Awards Made in Similar Cases

Finally, class counsel has shown that class members received the same monetary and non-monetary relief that Class Counsel has achieved in other court-approved class actions, alleging the same grounds for relief against financial institutions.  Fees Mot. at 10-11; Lozada Decl. ¶ 11.

### vi.    Summary

In sum, the Court finds that each of the *Omnivision* factors supports approval of class counsel's request for fees and costs.

### b.    Lodestar Method

As a final check on the reasonableness of fees, the Court may compare the requested fees with counsel's bills under the lodestar analysis.  *See, e.g., Vizcaino*, 290 F.3d at 1050 ("Calculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award.").  The lodestar method "requires multiplying a reasonable hourly rate by the number of hours reasonably expended on the case." *Shirrod v. Dir., Office of Workers' Comp. Programs*, 809 F.3d 1082, 1086 (9th Cir. 2015). "Where a lodestar is merely being used as a cross-check, the court 'may use a rough calculation of the lodestar.'" *Joh v. Am. Income Life Ins. Co.*, 2021 WL 66305, at *7 (N.D. Cal. Jan. 7, 2021) (quoting *Aguilar v. Wawona Frozen Foods*, 2017 WL 2214936, at *5 (E.D. Cal. May 19, 2017)); *see also In re Bluetooth*, 654 F.3d at 942, 944 (as long as the district court finds the fee reasonable, the Ninth Circuit permits courts to avoid the "time-consuming task of calculating the lodestar" by simply "award[ing] attorneys a percentage of the common fund.").

Class counsel's work in this case is broken down as follows:

| Attorney | Title | Admit Year | Rate | Hours | Lodestar |
|----------|-------|-----------|------|-------|----------|

United States District Court
Northern District of California

| Thomas Saenz | President and General Counsel | 1991 | $1,000 | 15 | $15,000 |
| Luis Lozada | Staff Attorney | 2019 | $420 | 92 | $38,640 |
| Eduardo Casas | Staff Attorney | 2022 | $320 | 26 | $8,320 |
| | | | **Total:** | **133** | **$61,960** |

Lozada Decl. ¶¶ 6, 9, 13, 31.  Counsel also provided summaries of the time spent by each attorney as of October 29, 2024, including each biller's position, hours, hourly rate, and each biller's tasks during this litigation.  *Id.*, Exs. A-B.  Upon review, the Court finds the reported hours spent litigating this case are reasonable.

"Affidavits of the plaintiff['s] attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiff['s] attorney, are satisfactory evidence of the prevailing market rate."  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990).  Class Counsel's hourly rates are supported by their own declarations attesting to their experience and similar awards in prior cases.  Lozada Decl. ¶¶ 6-13.  Further, the rates requested in this case are within the range of rates approved in wage and hour litigation in this District.  *See id.* ¶ 49; *see also Carlotti v. ASUS Computer Int'l*, 2020 WL 3414653, at *5 (N.D. Cal. June 22, 2020) (approving rates ranging from $950 to $1,025 in class action settlement); *Hefler v. Wells Fargo & Co.*, 2018 WL 6619983 (N.D. Cal. Dec. 18, 2018) (finding rates reasonable that were $650 to $1,250 for partners or senior counsel, $400 to $650 for associates); *Superior Consulting Servs., Inc. v. Steeves-Kiss*, 2018 WL 2183295, at *5 (N.D. Cal. May 11, 2018) ("[D]istrict courts in Northern California have found that rates of $475-$975 per hour for partners and $300-$490 per hour for associates are reasonable."); *Gutierrez v. Wells Fargo Bank, N.A.*, 2015 WL 2438274, at *5 (N.D. Cal. May 21, 2015) (finding reasonable rates for Bay Area attorneys of $475-$975 for partners and $300-$490 for associates).  "While the Court need not and does not decide that the exact rates requested by counsel are reasonable, they are at least within the range of reasonableness required to use the lodestar figure as a cross check."  *DiMercurio v. Equilon*, 2024 WL 2113857, at *10 (N.D. Cal. May 9, 2024).

Finally, the requested award of $35,000 is approximately 57 percent of the reported

United States District Court
Northern District of California

1    $61,960 fees.  "A negative multiple strongly suggests the reasonableness of a negotiated fee."

2    *Moreno v. Cap. Bldg. Maint. & Cleaning Servs., Inc.*, 2021 WL 4133860, at *6 (N.D. Cal. Sept.

3    10, 2021) (cleaned up); *DiMercurio*, 2024 WL 2113857, at *10 (same).  The lodestar cross-check

4    thus supports the fee award here.

5                            **c.    Summary**

6            In sum, both the percentage-of-recovery and the lodestar analyses support the requested fee

7    award of $35,000.

8        **2.    Costs**

9            **a.    Litigation Costs**

10           "There is no doubt that an attorney who has created a common fund for the benefit of the

11   class is entitled to reimbursement of reasonable litigation expenses from that fund."  *Ontiveros v.*

12   *Zamora*, 303 F.R.D. 356, 375 (E.D. Cal. 2014) (internal quotation marks and citation omitted).

13   Plaintiff requests $405 for filing fees.  Lozada Decl. ¶ 50 & Ex. C.  The Court finds these costs are

14   reasonable and therefore awards $405 in costs.

15           **b.    Settlement Administration Costs**

16           The Settlement Agreement also requests that the settlement administrative costs be paid

17   out of the Settlement Amount.  Plaintiff seeks an award of the costs for settlement administration

18   to RG2 in the amount of $13,000, which is the amount provided for in the parties' agreement.

19   Courts regularly award administrative costs associated with providing notice to the class.  *See,*

20   *e.g., Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015); *Ramirez*, 2022

21   WL 17722395, at *11.  The Court therefore concludes that the Settlement Administrator's costs

22   were reasonably incurred for the benefit of the class and approves the full amount to be deducted

23   from the Settlement Amount.

24       **3.    Service/Incentive Award**

25           Service or "[i]ncentive awards are fairly typical in class action cases."  *Rodriguez*, 563

26   F.3d at 958 (distinguishing incentive awards from incentive agreements, the latter of which are

27   "entered into as part of the initial retention of counsel" and "put class counsel and the contracting

28   class representatives into a conflict position from day one").  However, the decision to approve

                                        22

such an award is a matter within the Court's discretion.  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000).  Incentive awards "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputation risk undertaken in bringing the action, and, sometimes to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958-59.  Although incentive awards are viewed more favorably than incentive agreements, excessive awards "may put the class representative in a conflict with the class and present a considerable danger of individuals bringing cases as class actions principally to increase their own leverage to attain a remunerative settlement for themselves and then trading on that leverage in the course of negotiations." *Id.* at 960 (internal quotation marks and citation omitted).  Thus, "district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives." *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1164 (9th Cir. 2013).

In determining whether an incentive award is reasonable, courts generally consider:

> (1) the risk to the class representative in commencing a suit, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation; and (5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.

*Covillo v. Specialtys Café*, 2014 WL 954516, at *8 (N.D. Cal. Mar. 6, 2014) (quoting *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995)).  A class representative must justify an incentive award through "evidence demonstrating the quality of plaintiff's representative service," such as "substantial efforts taken as class representative to justify the discrepancy between [his] award and those of the unnamed plaintiffs." *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008).  Further, district courts must evaluate each incentive award individually.  *See Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003).

Plaintiff seeks an incentive award of $5,000.  The Court is satisfied that Plaintiff's individual contribution to this case warrants a service award.  Further, the risks Plaintiff assumed in attaching his name to this action are high, especially compared to ordinary consumer lawsuits, given that Plaintiff has non-permanent immigration status, which makes him a potential target for

harassment, and vulnerable to potential immigration consequences related to his status within the United States.  Finally, $5,000 is the amount deemed presumptively reasonable for such an award in the Ninth Circuit.  *See Lopez v. Bank of Am., N.A.*, 2015 WL 5064085, at *8 (N.D. Cal. Aug. 27, 2015) (noting that service awards of $5,000 are presumptively reasonable in the Ninth Circuit) (citing *Harris*, 2012 WL 381202, at *7 (collecting cases)).  Accordingly, the Court concludes that a service award of $5,000 is reasonable.

## V.    CONCLUSION

For the reasons stated above, the Court **GRANTS** Plaintiff's motion for final approval of the parties' class action settlement.  The Court also **GRANTS** Plaintiff's motion for attorney's fees and costs; specifically, the Court awards the following: $35,000 in attorney's fees; $405 in costs; settlement administration costs of $13,000; and a $5,000 service award to Plaintiff Ismael Antonio Rodriguez Perez.

The parties shall file a proposed judgment that complies with Federal Rule of Civil Procedure 23(c)(3) by January 30, 2025.

**Post-Distribution Accounting**

In accordance with the Northern District's Procedural Guidance for Class Action Settlements, within 21 days after the distribution of the settlement funds and payment of attorneys' fees, Class Counsel shall file "a Post-Distribution Accounting" that provides the following, to the extent applicable:

> The total settlement fund, the total number of class members, the total number of class members to whom notice was sent and not returned as undeliverable, the number and percentage of claim forms submitted, the number and percentage of opt-outs, the number and percentage of objections, the average, median, maximum, and minimum recovery per claimant, the method(s) of notice and the method(s) of payment to class members, the percentage of success for each method of notice and payment (if known), the number and value of checks not cashed, the amounts distributed to each cy pres recipient, the administrative costs, the attorneys' fees and costs, the attorneys' fees in terms of percentage of the settlement fund, plaintiffs' counsel's updated lodestar total, and the lodestar multiplier.

https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/.  Class

Counsel "should provide this information using the Court's Post-Distribution Accounting Form (available at /forms/civil-forms/) and file it as ECF event 'Post-Distribution Accounting' under Civil Events > Other Filings > Other Documents."  *See id.*

**IT IS SO ORDERED.**


Dated: January 23, 2025

THOMAS S. HIXSON
United States Magistrate Judge

United States District Court
Northern District of California